**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-11-0000350**
**14-FEB-2014**
**08:09 AM**

NO. CAAP-11-0000350

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


In the Matter of the Arbitration
of
NORDIC PCL CONSTRUCTION, INC., fka NORDIC CONSTRUCTION, LTD.,
Claimant/Counterclaim Respondent-Appellant,
v.
LPIHGC, LLC, Respondent/Counterclaimant-Appellee


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(S.P. NO. 10-1-0346)


MEMORANDUM OPINION
(By: Nakamura, C.J., Foley and Reifurth, JJ.)

This case involves a dispute concerning the performance of Claimant/Counterclaim Respondent-Appellant Nordic PCL Construction, Inc., fka Nordic Construction, Ltd. ("Nordic"), a subcontractor under a subcontract ("Subcontract") with Respondent/Counterclaimant-Appellee LPIHGC, LLC ("General Contractor") for concrete work on the Honua Kai South Enclave condominium resort property in West Maui ("Project"). Pursuant to the terms of the Subcontract, the parties mutually selected Retired Judge Patrick K.S.L. Yim ("Judge Yim") as a neutral arbitrator to arbitrate their dispute. Upon General Contractor's motion, the Circuit Court of the First Circuit ("Circuit Court")[1] confirmed the award issued by Judge Yim ("Award") and entered judgment accordingly.

---

[1] The Honorable Patrick W. Border presided.

On appeal, Nordic asserts that the Circuit Court erred by not vacating the Award because (1) "[Judge Yim] did not disclose his numerous financial and fiduciary relationships with the lawyers for one of the parties to the arbitration"; (2) the Award "was procured by false testimony and hidden evidence," which, at a minimum, required an evidentiary hearing; and (3) the Award "exceeded [Judge Yim's] authority".

Nordic appeals from the following orders and judgment entered in the Circuit Court: (1) the "Order Granting Respondent/Counterclaimant LPIHGC, LLC's Motion to Confirm Partial Final Arbitration Award of Arbitrator Filed on November 22, 2010 and Final Award of Arbitrator Dated December 15, 2010," filed on March 24, 2011; (2) the "Order Denying Claimant [Nordic's] Motion to Vacate Award of Arbitrator Filed on December 29, 2010," filed on March 24, 2011; and (3) the "Judgment," filed on March 24, 2011.

On the basis of Judge Yim's failure to disclose certain financial and other relationships with counsel, we vacate the Circuit Court's confirmation of the Award and its resulting Judgment, and remand the case for further proceedings.

I. BACKGROUND

In May of 2006, Nordic and General Contractor entered into the Subcontract for Nordic to perform concrete-related work on the Project owned by the Maui Beach Resort Limited Partnership ("Owner"). General Contractor was, in essence, a separately-incorporated aspect of the Owner, although it remained a distinct entity, and, functionally, was the Owner's construction entity. The Subcontract incorporated by reference the prime contract executed between the Owner and General Contractor.

As the concrete work progressed, General Contractor disputed whether much of Nordic's concrete work was adequately flat and level. Eventually, the parties entered into arbitration,[2] which the Subcontract prescribed as the exclusive

---

[2]     Nordic was represented by attorneys for Damon Key Leong Kupchak Hastert ("Damon Key"), while General Contractor was represented by attorneys for Starn O'Toole Marcus & Fisher ("Starn O'Toole") and Carlsmith Ball LLP ("Carlsmith").

remedy for disputes. The Subcontract specified that arbitration would proceed according to Hawaii Revised Statutes ("HRS") Chapter 658A (with certain exceptions not relevant here) and the Arbitration Rules, Procedures & Protocols adopted by the dispute agency, Dispute Prevention & Resolution, Inc. ("DPR") ("DPR Rules"). Pursuant to the DPR Rules, the parties mutually selected Judge Yim to resolve their dispute.

Consistent with HRS Chapter 658A, the DPR Rules impose certain disclosure requirements upon arbitrators:

> Neutral Arbitrators appointed pursuant to [DPR] Rules shall disclose in writing any circumstance, situation, or event which is likely to affect their ability to be impartial. Arbitrators must disclose (and under the [Revised Uniform Arbitration Act], Section 12(b), have a continuing obligation to disclose) any past, present, or possible future relationship with the parties, their witnesses, their counsel or another arbitrator including any bias or any financial or personal interest in the result of the arbitration.

Prior to his confirmation, Judge Yim, through a DPR case manager, provided the following disclosure to counsels for the parties by email dated March 17, 2009:

1. While serving on the bench, counsel and members of their law firms appeared before me;

2. Since retirement, I have served as a neutral for counsel and members of their law firms;

3. To the best of my knowledge, I do not know anyone involved with [General Contractor];

4. I served as a neutral in a matter where Nordic was a party. That matter was concluded at least five years ago;

5. I will provide additional disclosures as necessary throughout this proceeding;

6. These disclosures will in no way affect my ability to serve as a neutral and unbiased Arbitrator.

Prior to the Award, at no point did either party seek additional information from Judge Yim or object to having him serve, or continue to serve, as arbitrator.

The parties contested which of two concrete flatness and levelness standards applied to Nordic's work. Ultimately, Judge Yim found that Nordic had contracted to meet the more exacting of the two standards, although the parties had subsequently agreed to an alternate remediation standard in light

3

of Nordic's deficient work.

Also at issue was whether Nordic had proven its satisfaction of the applicable standard; this implicated measurements taken as work was performed. In relevant part, Judge Yim made the following findings:

> 95. The Subcontract required that Nordic, not the [General Contractor], measure the flatness and the levelness of the elevated slabs before the shores were struck, and to document that the specified standards were achieved.
>
> 96. The [General Contractor] was not required to do so.
>
> 97. Nordic was aware of the fact that Pete Allen Ardry ("Ardry"), its quality control engineer on the Project, was inexperienced in concrete construction.
>
> 98. When Nordic decided to utilize the F-meter to measure whether it had achieved the specified concrete flatness and levelness, Nordic was aware, prior to assigning Ardry as its quality control engineer on the Project, that Ardry had no experience with an F-meter.
>
> 99. Nordic was also aware of the fact that Ardry did not have any prior experience in concrete construction as required on this Project.
>
> 100. By at least November 9, 2006 when the [General Contractor] and Nordic were attempting to evaluate Nordic's work on the placement of the ground floor slab, Nordic had in its possession Allen Face's ("Face") October 3, 2006 letter in which he described the nine requirements for the proper FF/FL [flatness/levelness] testing procedure. Face's testimony demonstrated that Ardry failed to properly use the F meter, thereby substantially impacting the accuracy of the measurements reported to the [General Contractor].
>
> 101. Considering Ardry's reports and arbitration testimony, Nordic did not sufficiently establish that Ardry conducted his F meter measurements in accordance with the proper testing procedure, and that the measurements were accurate.
>
> 102. F meter measurements provided by Nordic were done solely by Ardry.
>
> 103. Under the Subcontract, Nordic alone is responsible for providing to the [General Contractor] reports of the F meter readings for each and every elevated slab for the Project.
>
> 104. The [General Contractor] did not have any obligation to provide to Nordic any results of its own F meter readings.

While not required to do so, General Contractor had collected "F-meter" data. It had also contracted with Face, an industry expert, to review Nordic's testing methodology and results. Face concluded that Nordic's test data were inadequate to demonstrate quality of work. Face therefore suggested that

Nordic's and General Contractor's data might be combined to produce sufficient statistically valid sampling data. Neither the conclusion nor the suggestion were shared with Nordic at that time.

An issue arose when, during discovery, General Contractor reported that it had lost most of its F-meter sampling data in a computer crash. Nordic sought to have the data construed adversely to General Contractor, but Judge Yim declined, finding that "Nordic failed to adequately demonstrate that the loss of [General Contractor's] F-meter data was as a result of spoliation of evidence."

Judge Yim further found that:

> 107. The failure of the [General Contractor] to provide said data to Nordic does not relieve Nordic of its obligations under the Subcontract to accurately collect and report F meter readings.

> 108. The [General Contractor's] loss of its F meter data is superfluous to any determination of the issues in this arbitration.

On October 15, 2010, after arbitration proceedings which spanned eighteen months and included thirty-one days of arbitration hearings, Judge Yim issued his Award in favor of General Contractor and against Nordic.

On October 29, 2010, via letter, Nordic requested that DPR provide "updated disclosure details . . . including, but not limited to, any and all arbitration or mediation matters involving attorneys from the law firms of either [Carlsmith] or [Starn O'Toole] . . . which Judge Yim has presided over since January 1, 2009 . . . ." DPR indicated that it would do so.

In the meantime, on November 2, 2010, Nordic sent another letter to DPR, asserting that:

> It has just come to our attention that [Judge] Yim has had an undisclosed, long standing professional relationship with opposing counsel . . . . We have reason to understand that [Judge] Yim was represented by the Carlsmith firm, including an attorney working on this case, on at least seven separate occasions over the last ten years. One of these cases was a matter that was ongoing . . . during the term of the parties' recent arbitration proceedings.

On the basis of Carlsmith's alleged representation of Judge Yim, and Judge Yim's nondisclosure of that representation, Nordic "demand[ed Judge] Yim's immediate disqualification as arbitrator.

. . . ." The referenced representation related to Carlsmith's representation of the Queen Lili'okulani Trust ("QLT"), for which Judge Yim had served as one of three trustees since 2002.

A flurry of letters followed. Nordic continued to press DPR for additional details and Judge Yim's disqualification, while General Contractor urged DPR to dismiss Nordic's request. General Contractor demanded that Nordic disclose "the precise timing and circumstances surrounding [its] 'discovery' of the facts" underlying Nordic's claim for disqualification. Counsel for Nordic declared that "information [regarding cases in which Judge Yim, in his capacity as QLT trustee, was represented by Carlsmith] was discovered by [Nordic] in late October, 2010, after which additional inquiry and requests for disqualification were issued."

On November 11, 2010, Judge Yim provided a Supplemental Disclosure to DPR, which DPR shared with the parties. It stated:

> In response to DPR's request, I hereby provide the following supplemental disclosures. These supplemental disclosures include my professional as well as volunteer activities.
>
> As previously disclosed, I have served as a mediator and an arbitrator in matters in which parties therein were represented by the firms appearing in this arbitration. Though I cannot recall any matter involving [General Contractor or Owner], I do recall serving as an arbitrator in a matter in which I determined that Nordic was the prevailing party.
>
> Further, at the time when I was informed that I was selected as an arbitrator in this matter, I was serving as a neutral in cases in which the Damon Key firm, the Carlsmith firm, and the Starn O'Toole firm represented certain parties therein. During the year and a half course of this arbitration, I served in an additional matter in which Lane Hornfeck of the Starn O'Toole firm represented a party. Sometime during this period, Robert Triantos of the Carlsmith firm entered an appearance on behalf of an additional party in an arbitration which commenced in 2008. I also, during this period, served as a mediator in a matter in which the Carlsmith firm was a party.
>
> As one of the three Trustees for the [QLT], I hereby disclose that the following are lawyers and law firms retained by the Trust since 2002, when I commenced to serve as a Trustee. The list is as follows: [lists over thirty attorneys or law firms, including Carlsmith]. As a Trustee, I have no personal role in the selection or appointment of attorneys that perform legal services for the [QLT].
>
> . . . .
>
> I also disclose that I believe Mr. Michael Walsh, Vice President of the [QLT's] Endowment Group, is [one of Nordic's attorney's] brother-in-law.

. . . .

> I have been informed by management of the [QLT] that in recent matters, members of the Carlsmith firm and [another] firm have represented parties who have opposed the interests of the [QLT]

Regarding his work as a neutral on matters that occurred either around the time that he was selected as an arbitrator or during the pendency of the instant arbitration proceedings, DPR disclosed that Judge Yim:

> served as a Mediator in a case where the Damon Key firm represented a party. Counsel for Damon Key was Mark Murakami, Esq. Counsel for the parties mutually selected Judge Yim in 2008, the mediation was held in February, 2009. DPR charged its standard hourly rate of $350/hour. This matter was included in the [initial] disclosure since the final invoice was issued to counsel on March 17, 2009.
>
> . . . served as an Arbitrator in a case where John Sopuch, Esq. of the Starn O'Toole firm represented a party. Counsel for the parties mutually selected Judge Yim in 2008. The Award was issued in February, 2009, and the final invoice was issued on March 13, 2009. DPR charged its standard hourly rate of $350/hour.
>
> . . . served as a Mediator in a matter where Lane Hornfeck of the Starn O'Toole firm represented a party. Counsel for the parties mutually selected Judge Yim in June 2009, and the matter closed in August 2009. DPR charged its standard hourly rate of $350/hour.
>
> . . . served as a Mediator in a matter where the Carlsmith firm was a party. Counsel for the parties mutually selected Judge Yim as Mediator in January 2009. The initial mediation session was held on March 6, 2009, and the matter closed in October 2009. DPR charged its standard hourly rate of $350/hour.
>
> . . . is serving as an Arbitrator in a case where Robert Triantos, Esq. at Carlsmith represented a party for a portion of the arbitration proceeding. The case was opened with DPR in 2008 and counsel participating at that time mutually selected Judge Yim as Arbitrator. In July 2009, Mr. Triantos' client was brought into the case via Court Order. Mr. Triantos' client settled out of the case in July, 2010 (Judge Yim was not involved in the settlement discussions). DPR is charging its standard hourly rate of $350/hour.

On December 1, 2010, DPR, without addressing the merits of Nordic's request, declined Nordic's request to disqualify Judge Yim, stating that once the substantive claims had been resolved, DPR no longer had jurisdiction regarding disqualification.

In the Circuit Court, General Contractor moved to confirm the Award and Nordic moved to vacate it. Nordic argued

7

for vacatur on the grounds that Judge Yim failed to disclose his relationships with General Contractor's counsel, General Contractor concealed evidence, and the Award granted damages to the Owner. On March 24, 2011, the Circuit Court issued orders granting General Contractor's motion and denying Nordic's, and issued its Judgment accordingly. The Circuit Court did not issue any findings of fact or conclusions of law.

This appeal followed.

II. STANDARDS OF REVIEW

> We review the circuit court's ruling on an arbitration award *de novo*, but we also are mindful that the circuit court's review of arbitral awards must be extremely narrow and exceedingly deferential.

> Judicial review of an arbitration award is limited by the following precepts:

>> First, because of the legislative policy to encourage arbitration and thereby discourage litigation, arbitrators have broad discretion in resolving the dispute. Upon submission of an issue, the arbitrator has authority to determine the entire question, including the legal construction of terms of a contract or lease, as well as the disputed facts. In fact, where the parties agree to arbitrate, they thereby assume all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact.

>> Second, correlatively, judicial review of an arbitration award is confined to the strictest possible limits. An arbitration award may be vacated only on the four grounds specified in [Hawaii Revised Statutes ("HRS")] § 658-9 and modified and corrected only on the three grounds specified in HRS § 658-10. Moreover, the courts have no business weighing the merits of the award.

>> Third, HRS §§ 658-9 and -10 also restrict the authority of appellate courts to review judgments entered by circuit courts confirming or vacating the arbitration awards.

*Kay v. Kaiser Found. Health Plan, Inc.*, 119 Hawai'i 219, 224, 194 P.3d 1181, 1186 (App. 2008) (internal quotation marks and citations omitted) (quoting *Schmidt v. Pac. Benefit Servs., Inc.*, 113 Hawai'i 161, 165-66, 150 P.3d 810, 814-15 (2006)).

III. DISCUSSION

    A.   Judge Yim's failure to disclose multiple relationships with General Contractor's law firms requires vacatur.

Nordic contends that Judge Yim failed to disclose multiple instances where, during the pendency of the arbitration proceedings, he was "hired to provide neutral services to both Carlsmith and [Starn O'Toole]"; and that in his capacity as a trustee of the QLT, he maintained an attorney-client relationship with Carlsmith, which represented QLT in several litigation matters in which he was a named party. On these grounds, Nordic argues that Judge Yim's nondisclosures constitute "evident partiality" requiring vacatur of the Award under HRS § 658A-23(a)(2).[3] We agree.

Hawai'i's disclosure statute requires an arbitrator, in relevant part, to "disclose to all parties . . . any known facts that a reasonable person would consider likely to affect the impartiality of the arbitrator . . . , including . . . [a]n existing or past relationship with any of the parties . . . , their counsel or representatives, a witness, or another arbitrator." HAW. REV. STAT. § 658A-12(a)(2) (Supp. 2012). This obligation also extends to "any [such] facts that the arbitrator learns after accepting appointment. . . ." HAW. REV. STAT. § 658A-12(b). When an arbitrator fails to disclose such a fact, then "upon timely objection by a party, the court under section 658A-23(a)(2) may vacate an award." HAW. REV. STAT. § 658A-12(d). Section 658A-23(a)(2) requires a court, upon a party's motion, to "vacate an award . . . if . . . [t]here was . . . [e]vident partiality by an arbitrator appointed as a neutral arbitrator[.]"

---

[3]     **Vacating award.** (a) Upon motion to the court by a party to an arbitration proceeding, the court shall vacate an award made in the arbitration proceeding if:

. . . .

(2)     There was:
        (A)     Evident partiality by an arbitrator
                appointed as a neutral arbitrator;
        (B)     Corruption by an arbitrator; or
        (C)     Misconduct by an arbitrator prejudicing
                the rights of a party to the arbitration
                proceeding[.]

HAW. REV. STAT. § 658A-23(a)(2) (Supp. 2012).

HAW. REV. STAT. § 658A-23(a)(2)(A).[4]

"Hawai'i's appellate courts have previously recognized that '[w]hat constitutes "evident partiality" sufficient to vacate an arbitration award is a difficult question.'" *Kay*, 119 Hawai'i at 226, 194 P.3d at 1188 (alteration omitted) (quoting *Daiichi Haw. Real Estate Corp. v. Lichter*, 103 Hawai'i 325, 339, 82 P.3d 411, 425 (2003)). As such, and with legislative history unavailing, "we have often turned to federal case law for guidance." *Id.*

Accordingly, "the Ninth Circuit Court of Appeals' interpretation of evident partiality . . . has been adopted and relied on by [our appellate courts]." *Kay*, 119 Hawai'i at 228 n.7, 194 P.3d at 1190 n.7 (citing *Daiichi*, 103 Hawai'i at 339, 340, 342, 82 P.3d at 425, 426, 428, and *Sousaris v. Miller*, 92 Hawai'i 534, 542, 993 P.2d 568, 576 (App. 1998)). In nondisclosure cases, evident partiality exists where "undisclosed facts demonstrate a 'reasonable impression of partiality.'"[5] *Daiichi*, 103 Hawai'i at 340, 82 P.3d at 426 (quoting *Valrose Maui, Inc. v. Maclyn Morris, Inc.* ("*VMI*"), 105 F. Supp. 2d 1118, 1124 (D. Haw. 2000)); *see also Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir. 1996) ("In nondisclosure cases, vacatur is appropriate where the arbitrator's failure to disclose

---

[4] The failure to make the required disclosures concerning the arbitrator's relationship to a party presumptively establishes the arbitrator's "evident partiality" necessary to vacate the award. *See* HAW. REV. STAT. §§ 658A-12(e), 658A-23(a)(2)(A). This presumption, however, does not apply where the failure to make required disclosures concerns the arbitrator's relationship to a party's counsel. *See* HAW. REV. STAT. §§ 658A-12(d), 658A-23(a)(2)(A).

[5] This court has previously observed that the "Ninth Circuit . . . ha[s] generally employed a relatively broad interpretation of a 'reasonable impression of partiality.'" *Kay*, 119 Hawai'i at 227, 194 P.3d at 1189. A useful point of contrast is *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278 (5th Cir. 2007).

In *Kay*, this court, responding to appellee's argument, "decline[d] to delve further into" *Positive Software*, finding it factually inapposite and noting that *Positive Software* had distinguished its own analysis from that of the Ninth Circuit. *Kay*, 119 Hawai'i at 228 n.7, 194 P.3d at 1190 n.7. *Kay* "decline[d] to rely on the *Positive Software* decision" and its "limiting interpretation of *Commonwealth Coatings [v. Continental Cas. Co.*, 393 U.S. 145 (1968)]." *Id.; see also Positive Software*, 476 F.3d at 283 (citing cases across a majority of circuits in support of "a narrow reading of *Commonwealth Coatings*" and noting that "[o]nly the Ninth Circuit has interpreted *Commonwealth Coatings* . . . to de-emphasize Justice White's narrowing language").

information gives the impression of bias in favor of one party."). Evidence of actual bias is not required. *Schmitz v. Zilveti*, 20 F.3d 1043, 1047 (9th Cir. 1994) ("Consistent with *Commonwealth Coatings*, courts examining nondisclosure cases have not required proof of actual bias in showing 'evident partiality.'").

We turn first to Judge Yim's failure to disclose the several instances where he was engaged as an arbitrator or mediator in external matters involving General Contractor's counsel while the instant arbitration was pending. This court has established that special weight is placed on the nondisclosure of potentially conflicting activities that occur *during* the arbitration proceedings. *Kay*, 119 Hawai'i at 229, 194 P.3d at 1191. And of particular relevance, the United States District Court for the District of Hawai'i held that an arbitrator demonstrated a "reasonable impression of partiality" where he engaged in undisclosed discussions with a party's counsel that led to his role as a mediator in an unrelated matter involving said counsel. *VMI*, 105 F. Supp. 2d at 1124.

In *Kay*, a patient entered into arbitration proceedings with an HMO, pursuant to the HMO's service agreement, after the HMO had been held "actionably negligent" for failing to diagnose the patient's brain tumor. *Kay*, 119 Hawai'i at 221, 194 P.3d at 1183. A divided arbitration panel decided against the patient, and the award was confirmed by the circuit court. *Id.* at 221-22, 194 P.3d at 1183-84.

This court vacated the award because one of the arbitration panel members, a doctor, had "fail[ed] to disclose her direct, personal involvement in ongoing, fund-raising solicitations to [the HMO], while the arbitration [was] pending, creat[ing] an impression of partiality or possible bias[.]" *Id.* at 221, 194 P.3d at 1183. The doctor, while having originally disclosed her prior role as president of the Hawai'i branch of a medical association, had failed to disclose that she had subsequently held several other positions within that organization, including outreach and fund-raising positions. *Id.* at 222-23, 194 P.3d at 1184-85. These positions, spanning a

period of several years prior to, during, and after the arbitration, entailed, in part, sending solicitation letters and thank you notes to various contributors, of which the HMO was one, with the HMO making one donation of $450 during the pendency of arbitration. *Id.* at 223, 230, 194 P.3d at 1185, 1192. These positions also required "various other interactions with [the HMO's] doctors and personnel in conjunction with diabetes-related programs." *Id.* at 223, 225, 194 P.3d at 1185, 1187.

The court was particularly concerned with the timing of the doctor's solicitations, noting that they "continued, undisclosed, during the pendency of the arbitration." *Id.* at 229, 194 P.3d at 1191. As to the doctor's overall relationship with the HMO in her association role, the court noted that "[her] dealings . . . were neither isolated nor in the distant past." *Id.* at 230, 194 P.3d at 1192. The court ruled that "an arbitrator cannot, as part of a long-standing and on-going activity, ask for and receive money from a party during an arbitration, without disclosing that fact to the other party." *Id.*[6]

In *VMI*, closely on point here, an arbitrator, while proceedings were underway, was contacted by one of the parties' attorneys about mediating a separate, unrelated matter. 105 F. Supp. 2d at 1119. He was ultimately appointed as mediator in that unrelated matter while the arbitration proceedings were still pendent, but failed to disclose either that appointment or the earlier solicitation. *Id.*

The federal district court, applying Hawai'i law, vacated the resulting arbitration award. *Id.* at 1124. The court acknowledged that the arbitrator "may have merely overlooked disclosing his conversation and appointment as [a] mediator" in the other matter. *Id.* It reasoned, however, that arbitrators

---

[6] The court noted a distinction between consumer (as in *Kay*) and commercial (as here) arbitration cases. *Kay*, 119 Hawai'i at 229, 194 P.3d at 1191. We do not read *Kay*'s observation, however, as intending to diminish in the commercial context its central emphasis on the importance of an arbitrator disclosing relevant business relations that occur while arbitration proceedings are ongoing or pendent. No amount of initial negotiation could compensate for the effect of an arbitrator's subsequent failure to maintain "fidelity to the disclosure obligation," which, as *Kay* reminds us, is "the sine qua non" of our review. *Id.*

have an obligation to avoid potential conflicts of interest, including professional or business relationships with parties' counsel, and that failure to disclose such potential conflicts may create a "reasonable impression of partiality."[7]  *Id.* Accordingly, the district court held that the arbitrator's lack of disclosure "was clearly a serious failing that warrant[ed] vacat[ur]."  *Id.*

These cases reflect the principle that arbitrators must take special care to disclose business or similar dealings with parties, or their counsel, that occur during the pendency of arbitration proceedings.  *See also Burlington N. R.R. Co.*, 960 S.W.2d at 630-31, 637 (vacating award for evident partiality where neutral arbitrator selected by parties initially disclosed past ties to one party's law firm but failed to disclose a post-selection referral by that party's appointed arbitrator for other arbitration work); *id.* at 638 ("[A] person might reasonably differentiate between a past relationship and one that arises shortly before or during the arbitration proceedings."); *see also Kern v. 303 E. 57th St. Corp.*, 204 A.D.2d 152, 152-53 (N.Y. App. Div. 1994) (vacating an award where a neutral "umpire" failed to disclose that one party's counsel had referred a third party to him for possible arbitration and appraisal work).  Of course, not just any contemporaneous association necessarily mandates vacatur.  *See Ashley v. Hart*, No. 28207, 2011 WL 682109, at *8 (Haw. Ct. App. Feb. 25, 2011) (declining to establish a rule that "the failure to disclose *ex parte* communications *per se* constitutes evident partiality"); *cf. Daiichi*, 103 Hawaiʻi at

---

[7]  In comparing that arbitrator's failure to disclose to another case, in which an arbitrator was held to have constructive knowledge of his law firm's representation of the parent company of a party, *see Schmitz*, 20 F.3d 1043, *VMI* emphasized the arbitrator's "actual knowledge of the conflict," and noted as well that the arbitrator had been apprised that he was to disclose "any relationship aris[ing] during the course of the arbitration[.]" *VMI*, 105 F. Supp. 2d at 1124.  While the record does not reveal whether there was a similarly specific apprisal here, Judge Yim averred that he would "provide additional disclosures as necessary throughout th[e] proceeding[.]" The parties were entitled to, and presumably did, rely upon this commitment. *See Burlington N. R.R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 637 (Tex. 1997) ("In basing their decision on [the arbitrator's disclosure], [the parties] were entitled to assume that [the arbitrator] would not enter into any new such relationship during the course of the arbitration proceedings without disclosing it.").

341, 82 P.3d at 427, ("[N]ot all dealings rise to the level of creating the impression . . . of possible bias so as to warrant vacating an arbitration award based on 'evident partiality.'" (citing cases involving nondisclosure of *prior* relationships)).

Here, Judge Yim failed to disclose his contemporaneous work as a neutral in three separate matters for General Contractor's law firms. Such contemporaneous business engagements are not trivial,[8] *VMI*, 105 F. Supp. 2d at 1124, and should have been disclosed. *See also Wheeler v. St. Joseph Hosp.*, 133 Cal. Rptr. 775, 792 (Cal. Ct. App. 1976) (vacating an award where an arbitration panel member was engaged as an expert witness in another case as a result of "one member of a large firm not being aware of what another member was doing").

Whether Judge Yim's failure to disclose the additional arbitrations he took on during the pendency of the instant arbitration is sufficient to establish evident partiality, we need not decide, as these were not the only relationships meriting disclosure. We turn now to the fact that Judge Yim also

---

[8] A California court noted the dangers of undisclosed referrals and engagements in the arbitration arena:

> One of the ethical problems the [California Legislature] was specifically concerned about was the danger that . . . arbitrators' impartiality might be undermined by their economic self interest. As one commentator pointed out, "[p]ayments to free market referees raise particular concerns insofar as referees may be influenced to decide cases in favor of the party more likely to bring cases to them in the future. . . . Similar parties in other contexts have been called 'repeat players,' but under the market conditions that prevail in reference, they might better be termed steady customers. Steady customers represent an important asset to any seller and a referee would find it in his self interest to favor these parties where possible. Of course, any favoritism could not be overt, for then the opponents of the steady customers would refuse to consent. But over time, referees could safely give steady customers the benefit of the doubt more often than not. Steady customers would suspect that their status was giving them a small edge, and this would bring them back into reference for future fights. But their opponents, the one-time customers, would not be aware of the subtle systemic bias working against them. They could not therefore make a fully informed choice when they consented to the reference."

*Benjamin, Weill & Mazer v. Kors*, 125 Cal. Rptr. 3d 469, 491-92 (Cal. Ct. App. 2011) (quoting Note, *The California Rent-A-Judge Experiment: Constitutional and Policy Considerations of Pay-As-you-Go Courts*, 94 Harv. L. Rev. 1592, 1608 (1981) (footnote omitted)). A mitigating factor in this case, however, is that Nordic's counsel, Damon Key, was also a "repeat player."

14

failed to disclose that, in the course of his service as a QLT trustee, the QLT was represented by Carlsmith in several litigation matters, including some that were contemporaneous with the arbitration proceedings.

General Contractor seeks to diminish the significance of this relationship, arguing that it was attenuated and that any attorney-client relationship was merely nominal, not substantial. Nevertheless, it was incumbent upon Judge Yim to disclose this relationship with Carlsmith. *See Beebe Med. Ctr., Inc. v. InSight Health Services Corp.*, 751 A.2d 426, 438 (Del. Ch. 1999) (vacating an arbitration award where the arbitrator failed to disclose that he was simultaneously represented in unrelated litigation by one party's counsel). Only then could Nordic have evaluated whether Carlsmith's representation of the QLT would affect Nordic's decision on whether to select Judge Yim as the neutral arbitrator or sought further information regarding this representation. *See Schmitz*, 20 F.3d at 1047 ("The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed.").

Besides downplaying Judge Yim's alleged attorney-client relationship with Carlsmith, General Contractor also contends that Nordic waived its right to claim evident partiality. General Contractor argues that Judge Yim's broad initial disclosure sufficiently encompassed any then-ongoing or future arbitral work with General Contractor's counsel in other matters. According to General Contractor, Nordic's failure to inquire further into that disclosure constituted a waiver of Nordic's right to claim evident partiality as to such other work. We disagree.

The well accepted rule in arbitration cases is that a party who fails to raise a claim of partiality against an arbitrator prior to or during the arbitration proceeding is deemed to have waived the right to challenge the decision based on 'evident partiality.'" *Daiichi*, 103 Hawai'i at 345-46, 82 P.3d at 431-32. But such waiver only occurs where the party can be held to have known, actually or constructively, of the

circumstances undergirding its claim.[9] *See id.* at 345 n.17, 82 P.3d at 432 n.17 ("To constitute a waiver, . . . the waiving party must have had knowledge, actual or constructive, of the existence of such a right at the time of the purported waiver."); *Bossley v. Mariner Fin. Grp., Inc.*, 11 S.W.3d 349, 352 (Tex. Ct. App. 2000) ("Implicit in this rule, however, is the idea that a party knows or has reason to know of an arbitrator's bias but remains silent pending the outcome of the arbitration.").

General Contractor's argument puts emphasis and relies on Judge Yim's use of the present perfect tense in his disclosure, in which he stated, "Since retirement, I *have served* as a neutral for counsel and members of their law firms." General Contractor argues that because this tense can denote acts that began in the past yet may continue up until and possibly into the present, Nordic was placed on notice "that Judge Yim may have ongoing work as a neutral in other matters involving [Starn O'Toole] or Carlsmith."

While there are uses of the present perfect tense that might encompass presently ongoing events, it is difficult to interpret Judge Yim's usage as referring to anything but engagements completed in the past. We do not expect parties to engage in a linguistics analysis to discern a latent possibility. If only a strained reading may be said to have encompassed facts worthy of disclosure, then for purposes of waiver, a party has not been placed on notice of such facts.

The burden of disclosure is upon the arbitrator, and parties should fairly expect an arbitrator to avoid opaque or ambiguous disclosures. While Judge Yim's statement did not detail each particular past engagement with the parties' counsels' law firms, it did fairly put the onus on the parties to

---

[9] Absent a showing that Nordic can be held to have known, pre-award, of Judge Yim's contemporaneous engagements with Carlsmith or Starn O'Toole, this puts to rest General Contractor's claim that Nordic's challenge cannot prevail simply because it is a post-award challenge. General Contractor cited to several cases in which courts found waiver where a party claimed evident partiality in a post-award challenge. In each of those cases, however, the basis for finding waiver was that the party knew or should have known of the undisclosed circumstances prior to the award, but remained silent until after the award was issued. As discussed *infra*, General Contractor fails to make such a showing.

inquire of those past details, if they cared to. *Cf. Daiichi*, 103 Hawai'i at 348, 82 P.3d at 434 (holding that an imperfect but adequate disclosure shifted the burden to the parties to object to avoid waiver). But it did not put them on notice to inquire as to what may yet come to pass. *Cf. Bossley*, 11 S.W.3d at 352 ("[T]he duty to inquire [into the potential for conflicts] is the arbitrator's burden, not the party's burden."). To the extent that there is no showing that Nordic was aware of Judge Yim's contemporaneous work as a neutral with Carlsmith and Starn O'Toole prior to issuance of the Award, Nordic has not waived its right to claim evident partiality. *Daiichi*, 103 Hawai'i at 345 n.17, 82 P.3d at 432 n.17.

In addition, while Judge Yim's initial disclosure provided some notice of his role as a neutral arbitrator in cases involving the parties' counsel, it failed to make any reference, or provide any notice, of his role as a trustee of the QLT and Carlsmith's representation of the QLT. Thus, unlike the issue of Judge Yim's work as an arbitrator in unrelated arbitrations involving the Carlsmith and Starn O'Toole firms, the issue of Judge Yim's role as a trustee of the QLT and Carlsmith's representation of the QLT was not raised at all in Judge Yim's initial disclosure.

Given the particular facts of this case, whether Judge Yim's failure to disclose any one of the undisclosed relationships gives rise to a reasonable impression of partiality is not squarely dictated by precedent. Yet, in the end, we need not separately resolve the effect of the failure to disclose each relationship. Taken together, Judge Yim's cumulative failure to disclose these several relationships sufficiently establishes a reasonable impression of partiality.

As we previously stated:

> Arbitrators wield great power over the scope and nature of the arbitration proceedings and all determinations of fact and law, with virtually no appellate review of their decisions. The fundamental "fairness" of these expansive powers must be grounded in the assurance that neutral arbitrators are indeed neutral and that the arbitrators will disclose any facts that might reasonably cause a party to question the arbitrator's neutrality. The only protection that arbitration parties have against prejudices, biases, or the appearance thereof, is the requirement that an arbitrator must disclose his or her past or existing

17

relationship with the parties, their counsel (or
representatives), witnesses, or another arbitrator.

*Kay*, 119 Hawaiʻi at 229, 194 P.3d at 1191.

Accordingly, we hold that Judge Yim's failure to disclose the aforementioned facts and relationships "shows a reasonable impression of partiality," and warrants vacatur of the Award. *Daiichi*, 103 Hawaiʻi at 339, 82 P.3d at 425,

B.   Nordic's other claims.

Nordic contends that the Award was procured by fraud or undue means, and that Judge Yim exceeded his powers in awarding damages to General Contractor. Because we vacate the Award on the basis of Judge Yim's failure to make the aforementioned disclosures, we decline to address these further claims.

IV.  CONCLUSION

For the reasons explained above, we vacate the Circuit Court's confirmation of the Award and its entry of the Judgment, and remand for further proceedings consistent with this opinion.

DATED:  Honolulu, Hawaiʻi, February 14, 2014.


On the briefs:

Kenneth R. Kupchak,
Anna H. Oshiro,
Mark M. Murakami, and
Christi-Anne H. Kudo Chock
(Damon Key Leong Kupchak Hastert)
for Claimant/Counterclaim
Respondent-Appellant.

Terence J. O'Toole,
Judith Ann Pavey, and
Zachary N. Gershuni
(Starn O'Toole Marcus & Fisher)
and
John P. Manaut
(Carlsmith Ball LLP)
for Respondent/Counterclaimant-
Appellee.

Chief Judge

Associate Judge

Associate Judge

18